565 A.2d 751

**Price L. ROGERS and Elaine Rogers, his wife, Appellants,**

v.

**JOHNSON & JOHNSON PRODUCTS, INCORPORATED, and Lankenau Hospital and Thomas Jefferson University Hospital, Appellees.**

Supreme Court of Pennsylvania.

Argued Dec. 5, 1988.

Decided Oct. 20, 1989.

James E. Beasley, Thomas R. Kline, William P. Murphy, Philadelphia, for appellant.

Alan K. Cotler, Philadelphia, for Johnson & Johnson Products, Inc.

Nancy L. Siegel, Philadelphia, for Lankenau Hosp.

E. Parry Warner, Philadelphia, for Thomas Jefferson Univ. Hosp.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION

NIX, Chief Justice.*

The issue in this case is whether a plaintiff proceeding on the strict liability theory of product malfunction will be precluded from having a jury decide the case if the manufacturer of the product introduces evidence of the negligence of another party as the cause of the malfunction. Contrary to the Superior Court, we conclude not.

The facts are that on May 1, 1977, Price Rogers entered Lankenau Hospital for the treatment of a broken leg. Dr. John J. Dowling, Lankenau's Chief of Orthopedic Surgery, and Dr. Lawrence Naame, a third year resident on rotation from Thomas Jefferson University Hospital, treated Mr. Rogers. Dr. Dowling recommended surgery which was scheduled for the following day. Dr. Dowling ordered the application of a plaster splint pending the surgery. Unlike a cast, a splint covers only part of an injured limb. Its application immobilizes the injured limb so as to prevent complications from, for example, the broken bone interfering with circulation.

Dr. Naame left the holding room to prepare the splint for application. This required arranging several layers of cotton insulation to be placed under a plaster wrapping product which itself required dipping in tepid or lukewarm water

* This case was reassigned to this writer.

and arranging or "reversing" in several layers. When dipped in water, the product reacted exothermically, as it should have.

After preparing the splint in this fashion, Dr. Naame returned to the holding room. There Dr. Dowling held up the injured leg while both physicians applied the insulation and the plaster wrap so as to form a splint on its underside. Mr. Rogers complained of a sensation of warmth. Dr. Dowling assured him this was to be expected. When the splint began to harden, Dr. Dowling lowered the leg and left the room to arrange for Mr. Rogers' admission into the hospital. Mr. Rogers complained to his wife, who was in the holding room, of a burning sensation. She applied ice to the uppermost part of the splint, at the top of her husband's thigh, and left the room to locate Dr. Dowling. She found him, informed him of her husband's complaints, and accompanied him back to the room. At that point, Mr. Rogers simply requested anesthesia should future painful procedures be required.

Prior to surgery the next morning, Dr. Dowling removed the splint. He discovered second and third degree burns on the back of the leg. Although able to undergo the open reduction surgery, Mr. Rogers experienced a longer, more painful recuperative period, requiring a skin graft, therapy, and home nursing for several months.

Mr. and Mrs. Rogers filed a complaint in trespass against Johnson & Johnson, manufacturer of the plaster splint, Lankenau Hospital and Thomas Jefferson University Hospital. The complaint alleged negligence and strict liability against Johnson & Johnson and Lankenau Hospital. It alleged negligence against Thomas Jefferson University Hospital. Johnson & Johnson answered by denying liability and cross-claimed against the hospitals.

At trial, the Rogers' case against Johnson & Johnson consisted of evidence of malfunction, failure to warn, and

negligence.[1] They also presented expert testimony eliminating medical malpractice as the cause of burns.[2]

Thomas Jefferson University Hospital likewise adduced evidence eliminating medical malpractice as the cause of the plaster's having burned Mr. Rogers. On the other hand, Johnson & Johnson introduced expert testimony indicating that the medical malpractice of the doctors had caused the splint to overheat and to burn Mr. Rogers. The trial court denied all motions for nonsuits and for directed verdicts save that of Lankenau Hospital with respect to its ostensible agency relationship with Dr. Dowling.

At the close of the evidence the jury was given a verdict form which directed it to decide first whether the Johnson & Johnson plaster was defective as a result of malfunction, second whether it was defective as a result of failure to warn the user, and if the answer to either of these questions was affirmative, to decide thirdly whether the defect was a substantial factor in bringing about the plaintiffs' harm. The jury returned a verdict against Johnson & Johnson only on the malfunction theory by answering affirmatively to that question and to the question of the malfunction's having caused the plaintiffs' harm. The jury

1. The notes of testimony reflect plaintiffs' fleeting reference to Johnson & Johnson's negligence in failing to test its product after manufacturing it. N.T. 1/25/84 at 70. The jury also heard deposition transcripts ostensibly supporting this claim. These depositions do not appear in the record and, therefore, this evidence has played no part in the conclusion we reach. We note that Johnson & Johnson has not argued that this evidence of post-manufacturing negligence mandates a different outcome.

2. Having carefully reviewed the record we must reject Johnson & Johnson's characterization of the plaintiffs' case as one which actively pursued a claim of medical malpractice. Although plaintiffs' counsel referred to medical malpractice in his opening and closing statements, he assiduously avoided arguing this theory as one espoused by the plaintiffs. Moreover, his *in camera* references to this claim could not, and did not, affect the plaintiff's ability to recover on a malfunction theory. *See infra* at 755, n. 6. Similarly we reject Johnson & Johnson's typification of the plaintiffs' expert testimony eliminating medical malpractice. We find this evidence to be more than merely conclusory. The opinion as to the cause of Mr. Rogers' burns reflected in-depth knowledge of the evidentiary and discovery facts upon which the expert founded his ultimate conclusion of due care, that is, the absence of malpractice.

did not answer or consider the question regarding a failure to warn. Per the trial court's instructions, once it answered affirmatively as to malfunction and causation, the jury did not reach remaining questions on the verdict form dealing with the negligence of any defendant.

Johnson & Johnson appealed the judgment following the denial of its post-trial motions. The Superior Court reversed and granted a new trial. The Superior Court concluded that because Johnson & Johnson had adduced sufficient evidence of negligence on the part of Dr. Naame to submit that issue to a jury, the plaintiffs had not sustained their burden of proof in eliminating reasonable, secondary causes for the malfunction. The Superior Court reasoned:

> In a case where there is sufficient evidence of negligent human intervention as a cause of the malfunction of a product to enable a trial court to conclude that an independent theory as to the cause of the plaintiff's injuries based on that negligence merits submission to the jury, the plaintiff has not sustained its burden of eliminating other reasonable secondary causes for the malfunction. Thus, the malfunction theory strict liability claim of such a plaintiff must fail in that he has failed to present a jury question as to the existence of a defect which is an essential element of his cause of action.

368 Pa.Super. 109 at 127, 533 A.2d 739 (1987). We are constrained to disagree.

Although the Superior Court has considered the malfunction theory of strict liability, *see Thompson v. Anthony Crane Rental Inc.*, 325 Pa.Super. 386, 473 A.2d 120 (1984); *MacDougall v. Ford Motor Company*, 214 Pa.Super. 384, 257 A.2d 676 (1969), this Court has never fully adopted it. *But see Kuisis v. Baldwin–Lima–Hamilton Corp.*, 457 Pa. 321, 319 A.2d 914 (1974) (plurality opinion). Since *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966), this Court has recognized a plaintiff's right to pursue an action in strict liability against the manufacturer of a product pursuant to section 402A of the *Restatement (Second) of*

*Torts.*[3] A plaintiff presents a *prima facie* case of strict liability by establishing that the product was defective and that the product caused the plaintiff's injury. *Sherk v. Daisy–Heddon,* 498 Pa. 594, 598, 450 A.2d 615, 617 (1982). In most instances the plaintiff will produce direct evidence of the product's defective condition. In some instances, however, the plaintiff may not be able to prove the precise nature of the defect in which case reliance may be had on the "malfunction" theory of product liability. This theory encompasses nothing more than circumstantial evidence of product malfunction. *See MacDougall,* 214 Pa.Super. at 391, 257 A.2d at 680. It permits a plaintiff to prove a defect in a product with evidence of the occurrence of a malfunction and with evidence eliminating abnormal use or reasonable, secondary causes for the malfunction. *See Thompson,* 325 Pa.Super. at 394, 473 A.2d at 125; *MacDougall,* 214 Pa.Super. at 391, 257 A.2d at 680. It thereby relieves the plaintiff from demonstrating precisely the defect yet it permits the trier-of-fact to infer one existed from evidence of the malfunction, of the absence of abnormal use and of the absence of reasonable, secondary causes. *See Thompson,* 325 Pa.Super. at 394, 473 A.2d at 125; *MacDougall,* 214 Pa.Super. at 391, 257 A.2d at 680. We now accept this evidentiary approach as appropriate in ascertaining the existence of a defect in the manufacturing process.

**3.** The *Restatement* provides:

Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

■ At the close of the plaintiff's case-in-chief, a defendant manufacturer will have three evidentiary avenues to pursue: the occurrence of the malfunction, the presence of abnormal use or the presence of reasonable, secondary causes. In this instance Johnson & Johnson attacked the plaintiffs' evidence eliminating secondary causation by introducing evidence of the doctors' malpractice. This evidence was sufficient to submit the issue of medical malpractice to the jury. As the Superior Court would have it, however, Johnson & Johnson was entitled to a directed verdict on the malfunction issue once it introduced sufficient evidence of secondary causation, i.e., medical malpractice, to permit this defense to go to the jury.[4] We cannot agree with this circular logic as it essentially mandates the grant of a directed verdict should the defendant manufacturer produce any evidence of reasonable, secondary causation.[5]

> [A] directed verdict should not be granted where there are factual questions to be submitted to the jury. If there is any conflict in the evidence, particularly when the evidence consists of oral testimony, if different inferences may reasonably be drawn from the evidence, or if the court would be called upon to pass upon the credibility of

4. Interestingly enough, the Superior Court did not address the issue of the trial court's having denied the hospitals' motions for nonsuit at the close of the plaintiffs' case. Since the plaintiffs abandoned their medical malpractice claims and presented no evidence in support thereof, the trial court erred in failing to grant the motions for nonsuit as to these claims. Such error, however, would not preclude the plaintiffs from proceeding to the jury with their malfunction theory.

5. We are not unmindful of language in the Superior Court opinion attempting to limit the scope of its application to those cases in which a defendant manufacturer presents more than a "scintilla" of evidence of reasonable, secondary causes. *Rogers*, 368 Pa.Super. at 128, 533 A.2d at 749. Despite this disclaimer, the decision essentially requires a plaintiff to hurdle two summary dispositions, first, a compulsory nonsuit at the close of the plaintiff's case-in-chief and, second, a directed verdict at the close of all the evidence. We believe that if a plaintiff's malfunction evidence suffices to overcome a compulsory nonsuit, then the evidence presented by the defense to establish reasonable, secondary causation constitutes an issue to be resolved by the jury.

witnesses or of their testimony, the case is not a proper one for a directed verdict.

9 *Standard Pennsylvania Practice 2d*, § 58.73 (1982). *See also Miller v. Checker Yellow Cab Company of Bethlehem*, 465 Pa. 82, 87, 348 A.2d 128, 130 (1975) (trial court must submit negligence questions to jury); *East Texas Motor Freight, Diamond Division v. Lloyd*, 335 Pa.Super. 464, 470–71, 484 A.2d 797, 800 (1984) (negligence a jury question unless facts leave no room for doubt). In this instance the plaintiffs' evidence refuted medical malpractice while the defendant manufacturer's evidence supported it. Depending on which version of the facts the jury chose to believe, which witnesses it deemed credible, in other words how it resolved conflicting evidence, it could have returned a verdict for either party on the issue of malpractice.

The Superior Court erred because it considered incompatible the plaintiffs' evidence of malfunction in light of the defendant, Johnson & Johnson's, evidence of a reasonable secondary cause. It rendered impossible the ability of the plaintiffs to negate secondary causes suggested by Johnson & Johnson's evidence and essentially required a directed verdict in favor of Johnson & Johnson. Contrarily, we believe that so long as the plaintiffs presented a case-in-chief free of secondary causes [6] which justified the inference of a defect in the product, the jury was free to accept their scenario.

Nor can we agree with the Superior Court's tacit conclusion that a plaintiff who has presented a malfunction case will always be precluded from proceeding upon an alternate theory of negligence. It is altogether possible that a plaintiff's injuries could be caused jointly by a defective product and also by third party negligence so long

6. In their pleadings the plaintiffs alleged both hospitals had provided negligent care to Mr. Rogers. In addition, plaintiffs' counsel made statements to the trial court that negligence provided a viable, alternative theory as to the cause of Mr. Rogers' burns. Contrary to the Superior Court we conclude that such allegations and statements, made outside the presence of the jury and made without the plaintiffs' having presented supporting evidence, cannot defeat the malfunction theory actually pursued by the plaintiffs at trial.

as the negligence does not constitute a supervening cause of the malfunction. "Given the occurrence of a malfunction, the [alleged] negligence assumes legal significance only if it was a superseding cause.... Questions of proximate causation should normally be left to the finder of fact." *Kuisis,* 457 Pa. at 330, 319 A.2d at 920.[7]

For the foregoing reasons, the order of the Superior Court is reversed and the matter is remanded to that Court for expedited consideration of the remaining issues raised by Johnson & Johnson in its initial appeal.

FLAHERTY, J., files a dissenting opinion in which ZAPPALA, J., joins.

McDERMOTT, J., did not participate in the consideration or decision of this case.

STOUT, former Justice, did not participate in the decision of this case.

FLAHERTY, Justice, dissenting.

I dissent. The majority, in what could be said to be a *res ipsa loquitur* approach, holds that so long as the plaintiff presents a case-in-chief free of secondary causes which justify an inference of defect in the product, the case may be sent to the jury on the "malfunction theory" regardless of whether evidence is admitted negating the very essence of the theory. In my view, sending the malfunction case to the jury without first allowing the defendant to move for a ruling on whether, as a matter of law, the defendant's evidence of secondary causation negates the plaintiff's claim of malfunction is error. Not providing for a legal determination of whether the plaintiff negated defendant's evidence of secondary causes (a legal requirement of stating a malfunction case) before sending the malfunction claim to the jury deprives the defendant of his right to

7. In this instance, for example, if the jury had chosen to believe Johnson & Johnson's evidence that Dr. Dowling's failure to heed Mr. Rogers' complaints regarding a sensation of warmth constituted negligence such negligence would not supervene the cause of Mr. Rogers' injuries, namely, the defective material of which the splint was made.

challenge whether the plaintiff has even stated a cause of action.

A malfunction-theory plaintiff argues, in essence, that while he has no *direct* evidence that the product is defective, he is prepared to establish that the product malfunctioned, from which the jury may *infer* that the product was defective. Once the plaintiff has established this, he has stated a prima facie case and his evidence will withstand a motion for non-suit.

The defendant, however, may put in evidence that the malfunction was caused by secondary causes separate and apart from any alleged defect in the product. If the defendant produces such evidence, the plaintiff then must negate it, *for the survival of his cause of action depends upon his establishing that nothing outside of the product itself caused the malfunction,* since if a "secondary cause" created the malfunction, the product itself was not defective and the products liability claim would fail. In other words, a malfunction-theory plaintiff must negate evidence that secondary causes were responsible for the malfunction.

The question which this raises, however, is what a malfunction-theory plaintiff must do in order to negate such secondary cause evidence. It is my view that the problem of determining whether a malfunction-theory plaintiff has negated secondary causes is analogous to deciding whether to grant a motion for a directed verdict; in both cases the proper inquiry for the court is whether the plaintiff put on evidence which, if believed, negates the claim made on the other side, here that there is evidence of secondary causes of the malfunction.[1]

---

1. A motion for a directed verdict comes at the end of all of the evidence and is either a request for the court to decide a question of law controlling the case, or it is an argument that the opposing party has failed to prove one or more necessary elements of the cause of action. In the latter, a directed verdict may be awarded only where there are no factual questions, no conflicts in the evidence, and no jury question of credibility of witnesses. In other words, when the claim is that the opposing party failed to put on a prima facie case or defense, a court will consider all evidence in the light most favorable to the party against whom the motion is directed and will not rule in

The plaintiff cannot be called upon to negate evidence of secondary causes absolutely, as Superior Court would have him do, for that would be to place a burden of proof too severe upon the plaintiff, too much in excess of the requirement that the plaintiff must produce a preponderance of evidence in order to prevail.[2] Nor can the trial court be called upon to assess the credibility of plaintiff's witnesses or the weight of the evidence, for those are jury functions. But the trial court is in a position to treat the matter as it would treat a motion for a directed verdict, by simply deciding *whether plaintiff's evidence, if believed, negates evidence of secondary causes.*

I conclude, therefore, that when a defendant has introduced evidence that secondary causes, not a defective product, caused the malfunction, the defendant should be allowed, at the close of all the evidence, to move for a directed verdict, based upon plaintiff's alleged failure to negate the alleged secondary causes. The court should resolve this motion by deciding whether, viewing the evidence in the light most favorable to the plaintiff, he has put on evidence which, if believed, negates secondary causes of the malfunction. If he has put on such evidence, he has negated evidence of secondary causes and the case should proceed to the jury on the malfunction theory.

It may be that under the standard proposed herein, in which the defendant's motion for directed verdict is defeated if the plaintiff's evidence, if believed, negates evidence of secondary causes, will not change the results in many cases. Nonetheless, a defendant should have the right to move the court to determine whether the plaintiff has met the legal

favor of the movant if a jury could reasonably conclude that liability rests with the party making the motion. *See* 9 *Standard Pennsylvania Practice 2d* § 58.73 (1982).

2. Superior Court's requirement that a malfunction-theory plaintiff may proceed only when he has eliminated even a jury question as to secondary causes would require a plaintiff's evidence to be controlling as a matter of law. Any negation of secondary causes less than this would result in a jury question, and would, in Superior Court's view, result in a defeat of the malfunction-theory plaintiff unless he was able to negate absolutely secondary causes, i.e., disprove them as a matter of law.

requirements of his case before the case is submitted to the jury.

ZAPPALA, J., joins this dissenting opinion.